80 So.2d 337 (1955)
The STATE of Florida, Appellant,
v.
FLORIDA STATE TURNPIKE AUTHORITY, a body corporate and politic of the State of Florida, Appellee.
Supreme Court of Florida. En Banc.
May 11, 1955.
*339 William D. Hopkins, Tallahassee, for appellant.
Richard W. Ervin, Atty. Gen., Frank J. Heintz and Ralph M. McLane, Asst. Attys. Gen., and W.R. Culbreath, Sp. Asst. Atty. Gen., and John T. Trimble, New York City, for appellee.
THOMAS, Justice.
One principle should be always borne in mind by the reader of this opinion: This court is not remotely concerned with the policy inherent in the legislative act that will be discussed, the wisdom of provisions for turnpikes being a matter solely within the province of the legislature. This court is now required only to review the order of the circuit court which validated the bonds, proposed to be issued for the construction of a link in the turnpike. The road has come to be called a "bob-tailed turnpike" but we, in the interest of brevity, shall call it the `partpike'. The pivotal question before us is whether the Florida State Turnpike Authority has acted within the power vested in that body by the legislature.
A petition was filed in the Circuit Court of Leon County by the Authority, an agency of the State created by Chapter 28128, Laws of Florida, Acts of 1953, F.S.A. § 340.01 et seq., seeking a decree validating bonds to be issued by the Authority, the proceeds of which would be expended immediately in the construction of the `partpike' at a location and on a course we take from the resolution adopted by the Authority and give in condensed form. According to the plan the `partpike' would begin at Hollywood Boulevard in Hollywood, Broward County, near the Seaboard Air Line Railroad and continue northerly "more or less," parallel to the tracks, to an intersection with State Route 84, approximately two miles west of U.S. Route 1, cross the south fork of New River, continue northerly, intersect N.W. 10th Street, in Fort Lauderdale near the railroad, thence cross State Route 814 opposite Pompano Beach at a point approximately one mile west of the railroad. The `partpike' would then continue northerly cross State Route 806 opposite Delray Beach, five miles west of U.S. Route 1, thence, still northerly, intersect State Route 704, opposite West Palm Beach about a mile and a half west of State Route 809, and continue northerly about eleven miles; thence it would go "in a general north to northwesterly" direction to intersect State Route 76 about four miles west of U.S. Route 1. From this point the route would extend in the same general north to northwesterly direction across the St. Lucie Canal to a point approximately three miles north of the south boundary of St. Lucie County, thence, northerly, to State Route 70, five miles west of Fort Pierce, "the northern terminus."
To the petition was attached a copy of the resolution providing for the issuance of bonds for an amount not exceeding $89,000,000 to pay for the construction. This document is more than one hundred pages long and there is no occasion to give the contents in detail, although we shall *340 refer to such parts of it as may be relevant to the discussion of the points developed in the briefs of the parties-appellant and -appellee.
When the petition was filed, the Judge of the Circuit Court of the Second Judicial Circuit executed his order directed to the "State of Florida, * * * property owners, taxpayers, citizens, including non-residents owning property or subject to taxation therein," and all others whose title or interest would be affected by the issuance of the bonds, requiring them, as well as the state attorneys of the circuits in which any portion of the `partpike' would be constructed, and the circuit in which the petition was filed to appear on a stated date and show cause why the proposed bonds should not be validated. The notice was ordered published for three consecutive weeks in newspapers published in each of the counties in which any of the `partpike' would lie, and in the County of Leon.
Separate answers were filed by all the state attorneys to whom notice was given; five property owners either answered or intervened and challenged the legality of the proposed bonds. The various objections raised will not be enumerated because those now urged are concentrated in the questions, presented in the briefs, that we will presently reach, discuss and answer.
Before the circuit judge decided the issues formed by the petition and the answers, the petitioners sought and obtained an order permitting the filing of a "supplemental" petition which in most respects was the same as the original with these noteworthy exceptions: The amount of the proposed issue of bonds was reduced from $89,000,000 to $74,000,000 and the projected route of the `partpike' was altered.
After the supplemental petition was filed, five of the intervenors withdrew their opposition, two state attorneys abandoned their objections relative to the excessiveness of the indebtedness, in view of the reduction of the amount of the planned issue, and a guardian ad litem for an incompetent person filed an answer. From our study of the whole record it appears that all assaults were eventually resolved in appellee's favor by the final decree. The seventh question, with which this court has already dealt, grew out of the action of the circuit judge in directing, after leave to file the supplemental petition had been granted, that the cause proceed without further order to show cause. In the brief the state attorney asks whether or not "Petitioner [was] required to give notice of its supplemental petition in the validation proceedings to any parties except those who had appeared in said validation proceedings."
This challenge was prompted principally, if not solely, by the fact that the supplemental petition incorporated amendatory resolutions not only diminishing the amount of the proposed issue, but also providing that the `partpike' begin on State Route 7 in Broward County approximately one-half mile south of Hollywood Boulevard, with a feeder road to Dade County, and extend northerly to an intersection with State Road 70 opposite Fort Pierce and approximately five miles west of State Road 5.
We understand from a study of the complicated description in the initial resolution and the relatively simple description in the amendment, and the advice we gain from the briefs of counsel, that approximately the south half of the route first described and the southern terminus were relocated from two to three miles westward, while approximately the north half and the northern terminus retained substantially the same position given them at first.
It appeared to the court that the seventh question should be determined in the beginning for the obvious reason that if the appellant prevailed, the case would have to be returned to the circuit court with directions to issue a new order to show cause and proceed thence to a final decision based on the new service. So the court heard *341 the matter and upon concluding that the appellant's position was not well taken, set the case for hearing on the other questions presented in the original briefs. This point was decided by the order to proceed but we will incorporate in this opinion our reasons for the ruling.
The appellant argued that the changes of the southern part of the route and the southern terminus were so material that the court could not proceed to a valid decree without a newly instituted proceeding, or a new notice to show cause issued and published after the amendment.
The general course and direction of the proposed `partpike' as well as the eventual termini of the turnpike were specified in the Act and certainly everyone was upon notice of the approximate place of beginning and ending and the approximate route that would lie between the two. It appears to us that on the face of the proceedings a deviation of three miles at the most for a distance of fifty-odd miles is so small that one claiming he saw the first petition and did not object, therefore, was mislead by the filing of the second, could not successfully press his point. It seems to us, too, and it seemed to us when we decided the matter on the order that in effect advanced the cause to a hearing on the merits, that even after construction began natural obstacles might be encountered that would make it necessary, sensible and practical to veer from the course originally fixed. In such circumstance could it be said that the Authority should then stop and petition the court for a validation of new bonds to meet the exigency on the theory that the bonds had become infirm or invalid because money raised to follow one plan would be misused in the pursuit of another?
That the Authority anticipated such a situation was indicated in the trust agreement where it was stated that the Authority would complete the project expeditiously according to plans and specifications "or such modifications or alterations thereof, including changes in design, alignment or location, as may be approved by the Consulting Engineers and which, * * * will not substantially increase the cost * * *." (Italics added.)
The proceeding under the statute was to validate bonds, not roads, and once it appeared that the general direction and termini were within the limitations fixed by the Act, and the bonds within the power of the Authority to issue, the shifting of the locations to the extent we have shown was not of such consequence that the change would undermine a decree based on the original notice. Cf. Pirman v. Florida State Improvement Commission, (and State Road Department of Florida), Fla., 78 So.2d 718.
As we have just said the procedure under Chapter 75, Florida Statutes 1953, and F.S.A., is one to validate bonds themselves, and while the authority of a petitioner to incur the debt and issue the bonds, and the proceedings providing for the issue must be set out, Section 75.04, if the decree "validates the bonds" it is conclusive of all matters adjudicated against the parties it affects and prohibits the calling into question of proceedings or remedies provided for collection. Section 75.09. Although the power to issue bonds for the construction of the `partpike' may not be divorced from the proceeding to validate the instruments, a subject we shall reach in considering some of the other questions, we do decide, in elaborating on the order, that the cause proceed to hearing on the merits, that if the Authority was empowered to construct the `partpike' along the route described in the first resolution and if it was empowered to build the `partpike' along the route described in the second resolution, the disparity between the two did not, because of the failure to require a new notice, divest the court of the power to proceed. Both locations appear to have conformed to the general location authorized by the Act; the latter resolution called for a smaller expenditure. The basic factor of power was unchanged. We do not accept the view that one who was satisfied with the first location could successfully urge his dissatisfaction with the second as a grounds *342 for disturbing the power of the court to adjudicate the validity of the bonds.
Under the Act, § 15, the bonds were required to be validated. The purpose of a decree of validation and its value to the bond buyer is that defenses to collection are set at rest in the beginning. It is difficult for us to understand how the collection of the debt when due could be defeated on the sole ground that the Authority set the course of the highway then changed it. The power to put it at either place raises a question we will decide presently.
The first of the state attorney's questions  the one just discussed was number seven  is a challenge to the constitutionality of Chapter 28128, supra, on the ground that the title does not comply with the mandate of Section 16 of Article III that "Each law * * * shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title * * *." The purpose of the provision has often been expounded by this court and there is no occasion to elaborate on it now further than to repeat that it was designed to prevent surprise or fraud upon the people and legislature that would arise from provisions hidden in the body of a law and not indicated in the title. State ex rel. Grodin v. Barns, 119 Fla. 405, 161 So. 568.
Although the state attorney contends that the law deals with more than one subject and that the title gives insufficient notice of certain contents, his attack seems to be centered on the absence from the title of language apprising a reader of the provisions in Sections 2, 7, 8, 9 and 14.
The parts of these sections considered by the appellant to have been insufficiently mentioned in the title are: "construction, maintenance, repair or operation of any toll turnpike project by any subdivision of the government of the State of Florida, subsequent to the enactment of this law, except upon specific authorization by the legislature * * *" is prohibited, F.S.A. § 340.02; the Authority may take over existing roads and may use them as part of the project, or discontinue them; all political subdivisions are authorized to lease, lend or grant any real property necessary or convenient to effectuate the purpose of the act; the State consents to the use of land owned by it to carry out the operation of the turnpike; and the State agrees not to limit the rights vested in the Authority to construct and operate the project or to collect such tolls as may be necessary to fulfill the terms of agreements with bondholders and to meet expenses.
The title of the Act is comprehensive, and the purpose of it is plain: to provide for the construction of a turnpike. All portions of the Act to which we have just referred seem relevant to the title and purpose or, as it is stated in the Constitution, connected with the subject, of which, we think, there is but one, and it is plainly stated.
The title serves notice on all that by the Act the Turnpike Authority is created; that its powers and duties are defined; that it is given the power to acquire real and personal property, and even to resort to eminent domain, to construct turnpike projects and finance them by issuing bonds payable from tolls and other revenues; and that authority is granted to counties, political subdivisions, public agencies and state officers to cooperate in the general plan. Without treating seriatim the provisions from the sections enumerated, we decide that when each of them and the title are placed side by side it is clear each is so closely associated with the title that no one could have read the one and have been led to believe that the others would not appear in the law.
The second and tenth questions are allied so we will discuss and decide them together. They amount to a charge that the proposed bonds, if issued, would violate Sections 6 and 10 of Article IX of the Constitution. The theory of the attack is that although the bonds will be "at least in name," to quote from the brief, *343 the debt of the Authority, the State will have a moral obligation to see that the debt is discharged. It is stated in the title of the Act that there is present in it a provision that the bonds will be payable solely from tolls and other revenues and that no debt of the State shall be incurred; it is expressly provided in the body of the law that the bonds "shall not be deemed to be a debt of the state or a pledge of the faith and credit of the state, but * * * shall be payable exclusively from the fund pledged for their payment or authorized herein"; it is stipulated in the proposed form of the bonds, included in the Authority's resolution, that the "State of Florida is not obligated to pay this bond or the interest thereon, and the faith and credit of the State of Florida are not pledged to the payment of the principal of or the interest on this bond."
The inhibition in the Act itself and in the bonds would preclude coercive collection from funds of the State or from taxation. The criterion is the legal remedy available in case of default, State v. Board of Control, Fla., 65 So.2d 469, and the Act and the proposed instrument serve notice on everyone concerned that there could be no affront to the sections of the Constitution which appellant cites. The language in the pertinent portion of Section 6 of Article IX is so plain as to defy elucidation: "The Legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection * * *." Of course, repulsion of invasion and suppression of insurrection are not involved. Further with reference to the matter of pledging the State's credit, we find nothing in this record that even indicates a disregard of the bar against such action save the suggestion that the State  again we quote from the brief  would "have a moral obligation to see that the same [bonds] are paid as they mature * * *." The claim of moral responsibility fades to nothingness in the light of the express prohibition of the organic law, imposed by the legislature on obligations undertaken by the Authority and embedded in the contract with the creditors.
The appellant next contends in his brief that the Act is a local or special law because in it the legislature directed that the `partpike' be presently built through only a small part of the state and that by designation of the Authority the improvement affects only the "counties lying between Broward and St. Lucie * * *." Cited as support for the position are the decisions in Collier v. Cassady, 63 Fla. 390, 57 So. 617, and State ex rel. Gray v. Stoutamire, 131 Fla. 698, 179 So. 730.
We adopt the view of the appellee that there is nothing in the cited cases that makes them akin to the present controversy. The ruling in the first seems opposed to the appellant's position for the court held [63 Fla. 390, 57 So. 618] that an act "need not be immediately in fact applicable everywhere" to save it from being classified as `local'. The intent of the legislature as expressed in the Act under consideration is clear: eventually to construct a traffic artery that will extend lengthwise through the State from Dade to Duval County. If the appellant's view should be accepted, it is difficult to see how it would be practicable to provide by general act for the building of a turnpike of such proportions unless it would be accomplished as one operation. If built piecemeal it could, presumably, be done only by virtue of a series of special acts. We cannot agree with this position.
In the second case, the court referred to local or special laws as relating to particular subdivisions or portions of the State, but we think the very nature of the present Act rescues it from that category.
The Turnpike Authority is a State agency charged with creating a highway that is bound, it seems to us, to affect traffic statewide. As a main artery to facilitate the flow of travel northward and southward not only by residents but by those who make up one of the principal industries of the State, the tourist industry, not to mention the many businesses incident to the use of the *344 motor vehicle, whether by resident or visitor, the entire State, will be affected. It is our opinion that such a turnpike may no more logically be said to be local than the aorta may be said to perform a local function independent of the other blood vessels of the human body.
We think our opinion in Cantwell v. St. Petersburg Port Authority, 155 Fla. 651, 21 So.2d 139, is much more relevant. The Railroad Commission had been authorized to grant franchises for the construction of bridges, ferries, and so on, over bays and inlets connected with the Gulf of Mexico.
The Act was attacked on the ground that it was a local law attempted to be enacted without regard for the constitutional requirements. The court observed that although many counties in the State were not adjacent to the Gulf, many of them were, and that the Gulf affected the people of the counties it did not touch. The court remarked: "It may therefore be said to affect directly or indirectly every citizen of the state."
The appellant insists, in the presentation of his fourth question, that the Act creating the Turnpike Authority is invalid because it carried a provision that one of the members should be a member of the State Road Department designated by the Governor. This, he urges, contravened Section 15 of Article XVI of the Constitution prohibiting any person from holding or performing the functions of "more than one office under the government of this State at the same time", and violated Section 27 of Article III because the appointing power of the Governor was attempted to be limited.
Although we said at the outset that we were not concerned with the wisdom of the Act, we permit ourselves the observation that there is an obvious relationship between the State Road Department and the Turnpike Authority. We think that when this relationship is considered there was in fact no creation of a new office to which the member of the State Road Department would be appointed, but only the imposition upon that member of additional duties, probably, from a practical standpoint, to create a liaison between a board charged with general supervision of the highway systems and one charged with construction of a turnpike, and now, immediately, a `partpike'. We do not discern any real difference between such an arrangement and the one which was under scrutiny in Whitaker v. Parsons, 80 Fla. 352, 86 So. 247. The State Livestock Board has been established and was to be composed of the Commissioner of Agriculture, the State Superintendent of Public Instruction, the State Treasurer and two others. This court said, in resolving the attack on the law, that no new offices were attempted to be created, but that new duties had been placed on existing officers. We construe the present Act to put upon the member of the State Road Board duties with reference to the projects which are definitely allied with the functions of the State Road Board and with the duties he performs as one of its members.
We apply the principle announced and decide this point in appellee's favor. Having concluded that no new office was created there is no need to discuss any attempted curtailment of the Governor's appointive power. In the circumstances, the Governor only "designated", as the Act required, the member of the State Road Board who should assume the added powers and duties of membership in the Authority.
We quote the next of appellant's questions: "Does the Turnpike Act require the Southern Terminus of the presently proposed Turnpike Project to be located in Dade County, Florida?" In the brief the action of the Authority is called "a flagrant and express violation of the clear requirements of the Turnpike Act." This charge is predicated on a statement in the Act, appearing in Section 3, that the legislature approved as a general location "for a turnpike project, a route extending [northward] from a point in Dade County" and authorized the construction and operation of the project only on a route "beginning at a point in Dade County, * * *" while the Authority, as it is argued, fixed the southern *345 terminus of the `partpike' in Broward County. We think that to adopt the view would require us to lift the quoted parts of the Act out of context and ascribe to them an independent definition or interpretation they do not warrant. It is not enough to say that the actual construction work should commence somewhere in Dade County and that if begun anywhere else the Authority would exceed its powers. The obvious purpose of the legislation was to build an artery between Dade and Duval Counties in a "general northerly direction."
In Section 3, after approving the general route and name of the turnpike it was specified that "a turnpike project" should be built and operated only at a named location "or such part or parts thereof as the authority may determine to be suitable for a project as contemplated by this act * *." There follow the words already quoted: "beginning at a point in Dade County" and a restriction that the `partpike' be not more than one hundred and ten miles long. The exact route and termini were required to be determined as provided by Section 6 and sub-section 6 which read: "The authority shall have the following powers: * * * (6) To determine the exact route and exact termini of turnpike projects."
So the Authority was to determine the "part or parts" to be constructed and the exact route and termini and were restricted to the general northerly route and, until further legislative authority, to a `partpike' one hundred ten miles from Dade County northward.
From this language it is plain that to say that construction must begin somewhere in Dade County would require an interpretation of a portion of the Act that would be too literal. Certainly no one would seriously contend that the Authority could start at the southernmost part of Dade County. If that were done a goodly portion of the `partpike' would be built in only that county.
The point of beginning, as we understand the section taken as a whole, referred to location, and the Authority was to construct "part or parts" of a `partpike' one hundred ten miles long according to their judgment as to suitability. We think that the test is whether the `partpike' when completed shall extend northward from a point in Dade County. The present plan is to build a road a little more than one hundred three miles in length. If construction actually starts at the place contemplated, approximately two miles and a half from the north line of Dade County, an extension on the south could readily be made to reach Dade County and still the operation would be well within the limitation of length.
To cap the discussion, we turn to Section 11 of the Act in which it is provided that feeder roads "taken over" shall become parts of the project. Evidently such a road leads into Dade County so it may be said that in view of the pertinent provisions of the law the `partpike' as planned would conform to the plan contemplated by the legislature, because the `partpike' in which the feeder road is a link will extend northward from Dade County.
By his sixth question the appellant assails Section 10 of the Turnpike Act which prescribes the method of exercise by the Authority of the power of eminent domain and the effect upon a property owner of the exercise of that power in the manner prescribed. How such a question could be pertinent in this proceeding, to validate bonds, we do not understand. Whether or not the section will ever be used is problematical, and if it ever is then an aggrieved property owner will doubtless find his remedy. We think the question is now premature and beside the real point, so we decline to answer it.
The appellant asserts in presenting his eighth question that the Turnpike Act should be declared invalid because by it the legislature improperly delegated its powers to the Authority. The particular provisions to which appellant points an accusing finger are found in Sections 14, 16 and 23, agreeing that the State will not limit or restrict rights vested in the Authority to fulfill agreements with bond-holders; *346 allowing, in addition to conditions to be incorporated in a trust agreement between the Authority and a corporate trustee to secure the bonds, the inclusion of such other provisions as the Authority may consider reasonable "for the security of the bond-holders", F.S.A. § 340.16; and permitting traffic control on a project though inconsistent with vehicle and traffic laws of the State.
When the legislature enacts a law complete in itself to accomplish a general public purpose it may authorize, within definite limitations, designated officials to promulgate rules and regulations to effectuate the purpose, State ex rel. Young v. Duval County, 76 Fla. 180, 79 So. 692; State v. Atlantic Coast Line R. Co., 56 Fla. 617, 47 So. 969, 32 L.R.A.,N.S., 639.
It is our view that in accomplishing the plan, the construction and establishment of a turnpike, the borrowing of vast sums of money, the operation of the turnpike with due regard for the safety of travellers and for a profit that will insure the retirement of the debt, it would be necessary for the Authority to have the powers granted and that the exercise of those singled out for attack are well within the sphere of the scheme and well within the rule announced in the cited cases. What we have said disposes of the last two objections. As to the first we simply say that there is no delegation of power in declaring that the Authority will not be restricted in fulfilling agreements into which it had the right to enter.
We reach question number nine. Sections 4(3) (b) and 27 relate to the advancement by the State Road Department of funds for preliminary expenses in getting the construction of the turnpike underway and for the reimbursement of the department from the proceeds of the bonds. Again we construe the Act in its entirety, Florida State Turnpike Authority v. MacVicar, Fla., 67 So.2d 210, and decide that the procedure prescribed is legal. We are not dissuaded from the view by appellant's apprehension about the situation that would arise in the event the bonds could not be sold. We think the legislature legally provided for preliminary expenditures and that it is not necessary to wait until the bonds are sold and the money is in hand before taking any steps to launch the project.
After a careful study of the record and briefs and consideration of the arguments of counsel for the parties, we come to the conclusion that the decree of the circuit judge should be
Affirmed.
DREW, C.J., and TERRELL and SEBRING, JJ., and MURPHREE, Associate Justice, concur.
BUFORD, J., dissents.