134 So.2d 12 (1961)
STATE of Florida et al., Appellants,
v.
FLORIDA STATE TURNPIKE AUTHORITY, a body corporate and politic of the State of Florida, Appellee.
No. 31128.
Supreme Court of Florida.
November 2, 1961.
Rehearing Denied November 15, 1961.
*14 William D. Hopkins, Tallahassee, for State of Florida.
Walter Warren, Leesburg, for Rochester & Goodell Engineers, Inc.
Ford L. Thompson, Tallahassee, for Thomas B. Grizzard, C.H. Pitts and A.W. Smith, appellants.
John W. Rowe, Clearwater, Richard W. Ervin, Atty. Gen., Gilbert A. Smith, Tampa, and Patterson, Freeman, Richardson & Watson, Jacksonville, for appellee.
DREW, Justice.
These are consolidated appeals from a final decree of the trial court validating and confirming $160,000,000 of Turnpike Revenue Bonds, Series of 1961. The appeals were taken by William D. Hopkins, State's Attorney for the Second Judicial Circuit (hereafter referred to as the State), Thomas B. Grizzard, C.H. Pitts and A.W. Smith[1] (hereafter referred to as the Grizzard group) and Rochester & Goodell Engineers, Inc.[2] (hereafter referred to as the Engineers). The appellee will be hereafter referred to as the Authority.
Before proceeding with the determination of the merits of this appeal, it is necessary to dispose of certain procedural matters occurring at the time of and following the hearing held on the rule nisi in the cause and presented at the oral argument before the Bar of this Court. Prior to the return day, the Engineers filed their motion to dismiss the petition to validate "for the reason that it shows upon its face that the petitioner is attempting to pledge taxes for the payment of the proposed bonds which are illegal and unlawful and cannot be pledged therefor." On the day and at the hour fixed in the rule nisi, the attorney for the Engineers was not present. The trial court announced at the time that he had received a request from the attorney for a continuance because of a previous engagement out of the State. Such continuance was opposed by the Turnpike Authority. After hearing argument, the trial judge denied the request.[3]
*15 The validation statute[4] provides that at the time and place designated in the rule nisi:
"* * * the judge shall proceed to hear and determine all questions of law and fact in said cause, and may make such orders as to the proceedings and such adjournments as will enable him to properly try and determine the same and to render a final decree therein with the least possible delay."
The law and the rules of this Court are designed to expedite the disposition of proceedings for the validation of bonds.[5] This is required by the very nature of the proceedings themselves and the fact that the public interest is involved in each case. While the statute empowers the trial judge to grant adjournments of the hearing provided for in the rule nisi, none should be granted in the absence of a clear and compelling reason. All interested parties have been afforded adequate notice and sufficient time to prepare their case for presentation on the return day and those who desire to do so should be present at such time and place and ready to proceed. The law and rules comtemplate such expediency and the courts should, as the learned trial judge did here, require compliance. There was no error or abuse of discretion in denying the motion for continuance.[6]
The court thereupon proceeded with the hearing on the issues presented by the petition to validate and the various answers filed thereto.[7] At the conclusion of said hearing, and on the same day, the decree from which this appeal is prosecuted was rendered.
Subsequent to the entry of the decree validating the bonds, the Engineers applied by telegram to the trial court for leave to file an answer and for a rehearing.[8] The court denied the petition for rehearing and struck the proposed answer. In both respects the trial judge was correct. The notice of appeal transferred complete jurisdiction in the cause to this Court.[9] Moreover, when the Engineers filed the notice of appeal after they had filed the petition for rehearing, they abandoned the latter.[10]
Finding no reason to disturb any of the actions of the trial court with respect to matters of procedure, we now direct our attention to the reasons assigned by the various appellants in support of their respective arguments that the decree validating the bonds is erroneous. To simplify and clarify the discussions of the various contentions which will follow, a brief resume of what is proposed to be done by the Turnpike *16 Authority with the proceeds to be derived from a sale of the $160,000,000 of bonds validated by the trial court is set forth below.
The original act creating the Turnpike Authority[11] authorized it to construct a toll road from a point in Dade County in a general northerly direction to a point in Duval County, Florida. Pursuant to this act, the Turnpike Authority adopted a resolution authorizing the issuance of $89,000,000 of bonds (later reduced to $74,000,000) to build 110 miles of the turnpike from a point in the southerly end of Broward County northward to a point west of the City of Fort Pierce. A decree of the Circuit Court of Leon County validating this issue of bonds was affirmed by this Court in its decision hereafter referred to as the first turnpike case.[12] In 1955, after the first section of the authorized turnpike was completed, the Legislature amended the act[13] and provided for an additional turnpike project to be located by the Authority as it may deem suitable:
"* * * `Beginning at a point in St. Lucie county, thence in a generally northwesterly direction to a point in Lake county, thence in a generally northerly direction through Marion county to a point in Duval county, in the vicinity of the metropolitan area of the city of Jacksonville, provided however, that the exact route and termini shall be as provided in § 340.06(6).' F.S. § 340.03(2), F.S.A." State v. Florida State Turnpike Authority, 89 So.2d 653, 656 (Fla. 1956).
In order to finance the construction of said additional project, the Authority adopted a resolution authorizing the issuance of $185,000,000 of Turnpike Revenue Bonds, Series of 1956. A decree of the Circuit Court validating these bonds was approved by this Court in the second turnpike case.[14]
On July 24, 1961, as a result of extensive feasibility studies conducted by the engineers and financial advisors of the Authority, a resolution was adopted by it reciting the construction of the first turnpike project and the issuance of the $74,000,000 of revenue bonds pursuant to the terms of the 1955 Trust Agreement to finance such project and reciting that $64,119,000, principal amount of the 1955 bonds, were outstanding. The resolution further determined that it was necessary and suitable to forthwith construct as a part of the turnpike project authorized by the legislative act an additional portion of the authorized project (designated as Turnpike Project No. 2) along the following route to the termini therein stated:
"Beginning with the northern terminus of Turnpike Project No. 1 in the vicinity of the City of Fort Pierce, St. Lucie County, Florida, and extending in a generally northwesterly direction through St. Lucie, Indian River, Okeechobee, Osceola and Orange Counties, to the vicinity of the City of Orlando, and continuing westerly through Orange County to a point in Lake County near the southwest corner of Lake Apopka; then in a generally northerly direction toward Marion County through Lake and Sumter Counties to connect with interstate Route 75 in the vicinity of the City of Wildwood, Florida."
The resolution further determined and found it to be necessary and desirable to *17 operate Project No. 1 and Project No. 2 as one undertaking and to that end to redeem as a whole all outstanding bonds of the 1955 issue at their first redemption date, viz. April 1, 1962; to provide monies for such purpose and to build and complete turnpike Project No. 2 it was necessary to issue revenue bonds in the amount of $160,000,000. The proceeds of the sale of such bonds would be used not only to redeem the 1955 issue of bonds and to construct Project No. 2 but "for the other purposes more particularly referred to in the Trust Indenture" authorized in said resolution. One of the items set forth in the Indenture was the sum of approximately $450,000 to reimburse Arvida Corporation for expenditures advanced by it in the construction of the Boca Raton interchange which was opened to traffic on June 10, 1961. This specific provision is the subject of one of the assignments of error by the appellants and will be referred to hereafter at greater length.
Another provision contained in the Indenture and to which reference will now be made because it also is the subject of an assignment of error by appellants is Section 7.16, reading as follows:
"Certain Projects. The Authority covenants that it will not construct any other Turnpike Project, in addition to the Projects to be constructed and financed under the Indenture, if the construction of such other Turnpike Project will materially and adversely affect the Revenues. The Authority covenants that whenever there shall come to the attention that any Federal, State or other agency shall project or plan the construction, improvement or acquisition of any highway or other facility which may be materially competitive with any part of the Turnpike System and in the same traffic corridor, it shall cause the Traffic Engineers to make a study of the effect of such proposed highway or facility upon the operations of the Turnpike System. If, in the opinion of the Traffic Engineers, such highway or facility may be materially competitive with any part of the Turnpike System, the Authority covenants that it shall not agree or consent to the construction, improvement or acquisition thereof unless it can then comply with the earnings tests for the issuance of additional Bonds under the provisions of paragraph (2) of Section 2.05 (except that the estimated date of completion of such highway or facility shall be used in place of the date of authentication and delivery of additional Bonds)."
The resolution further fixed the designation of said bonds as "Turnpike Revenue Bonds, Series of 1961", provided for an interest rate of not to exceed 5% (the maximum rate fixed in the authorizing act) and that such bonds should mature, subject to the right of prior redemption, on November 1, 2001. Other details with reference to the mechanics of handling and provisions of said bonds not necessary to this discussion were set forth in the resolution. The resolution specifically provided:
"* * * The State of Florida shall not be obligated to pay the 1961 Bonds or the interest thereon, and the faith and credit of the State of Florida shall not be pledged to the payment of such principal and interest. The issuance of the 1961 Bonds shall not directly or indirectly or contingently obligate the State of Florida to levy or to pledge any form of taxation whatever for the payment of the 1961 Bonds or the interest thereon or to make any appropriation for such payment."
The resolution further provided that such bonds should be issued under and secured by a Trust Indenture, all of the terms and provisions of which were authorized in and approved by said resolution and, according to the terms of said resolution, were made a part thereof.
*18 We now direct our attention to the specific points raised and argued in this appeal by the appellants and shall first dispose of the contentions of the Grizzard group.
The Grizzard group argues that the Authority does not have the legal authority to construct Project No. 2 along the route and with the termini described either separately or in combination with turnpike Project No. 1. These appellants argue that the continuance of the project from a point in Lake County west-north-west or thereabouts into Sumter County to connect with Interstate 75 instead of northerly in Lake County to and then through Marion County constitutes a material departure from the legislatively designated route and, therefore, is a gross abuse of the discretion vested in the Turnpike Authority. In the second turnpike case the route established and approved by the trial court and this Court as being in substantial compliance with the legislative act also extended into Sumter County for some distance before continuing northerly in and through Marion County slightly east of the City of Ocala. The present route extends further west in Sumter County but the difference is inconsequential insofar as it relates to the question of whether there has been shown a gross abuse of power by the Authority. In the second turnpike case, this Court expressly held that the route there approved was in compliance with the legislative mandate which fixed generally the route to be followed but authorized the Authority to fix the exact location and termini. This point is obviously without merit.
The Grizzard group next argues that the finding of the lower court in the final decree that Interstate 95 from the Georgia line to Daytona Beach is not in the same traffic corridor as the turnpike project is not supported by substantial competent evidence. This contention arises out of a resolution adopted by the Authority on September 13, 1961 that "for the purpose of 7.16 of the Trust Indenture that portion of Interstate Route 95 as presently proposed * * * and the portion of Interstate Route 4 as presently proposed * * * are not within the same traffic corridor as existing Turnpike Project No. 1 and Turnpike Project No. 2 as now authorized." The controversy about Section 7.16 is not germane to the question of the validity of the proposed issue of revenue bonds. The obvious purpose of Section 7.16 is to prevent the Authority from cooperating in the construction of a competing road. This resolution was adopted prior to the sale of any bonds proposed to be issued under the resolution and Trust Indenture and the rights of any person who purchased such bonds would be controlled by the findings of the resolution. This section of the Trust Indenture does not and cannot constitute any contract between the State of Florida or any of its political subdivisions or agencies (with the possible exception of the Turnpike Authority) and the holders of any obligations issued pursuant thereto. It does not and cannot in any way prevent the State Road Department, the Federal government or any county or political subdivision of this State from constructing highways in any location that shall be deemed to be in the interest of the general welfare whether in the corridor of the turnpike project or not.[15]
*19 The contention of the Grizzard group that the Trust Indenture, exhibits and testimony show that the Turnpike Authority will be required to make an illegal, unlawful and unconstitutional expenditure of a portion of the proceeds if said bonds are validated and sold is directed to that portion of the Trust Indenture and exhibits relating to the reimbursement of Arvida Corporation for the construction of the interchange at Boca Raton. We have carefully examined the disclosures of the record with reference to this matter and we find no valid objection either to the original plan by which the interchange was constructed or to the proposal to reimburse Arvida Corporation for the amount spent in connection therewith. It is true, of course, that Arvida Corporation is benefited to a large degree by this facility because of its extensive interests in the vicinity thereof. It is equally true that this interchange is a useful and necessary part of the turnpike system and built in a fast growing area requiring access to and egress from the turnpike. Section 340.07(1) of the act gives the Authority the full power to construct interchanges and Section 340.06(18) authorizes the Authority to "do all acts and things necessary or convenient to carry out the powers and duties expressly granted in this chapter." The financing and construction of this interchange in the manner in which it was done and the necessity therefor was purely an administrative matter involving business judgment and discretion of the Authority. Subsequent events as shown by the record verify that the Authority exercised sound judgment. Even if it had not, it would be of no concern to this Court.
The fact that Arvida Corporation financed the original construction and will benefit from it does not destroy the public nature of the project itself.[16]
It is next contended by the Grizzard group that the proposed turnpike project plans are not financially and economically feasible and are not basically sound. The testimony of the chairman of the Authority, the testimony and exhibits of the traffic engineers and the consulting engineers and the testimony of the investment bankers who appeared before the trial judge for the purpose of establishing the feasibility of the project from a business, financial and engineering standpoint establishes without contradiction the feasibility of Turnpike Project No. 2. There is no contrary evidence, nor is there any showing in this record of any such abuse of discretion on the part of the Authority as would warrant this Court in interfering. Whether the building of toll roads is a sound policy to be followed is one over which this Court has no control. The Legislature in its wisdom has authorized such project and this record shows that the Authority created by the Legislature to carry out such plan has exercised its authority within the law. Moreover, the question of the fiscal soundness or advisability of refunding the $64,000,000 of 3 1/4% bonds with bonds bearing an interest rate of close to 5% is also a matter involving the exercise of business judgment and this Court is without any authority to substitute our opinion in the matter for that of the Authority. In the Gate City Garage case (footnote 16 supra), in commenting upon the attack as to feasibility of the bond issue there before us, this Court said:
"The findings of fact by the Chancellor as set forth in the final decree, as to *20 the feasibility of the plan, sufficiency of revenues and all other questions, are amply sustained by substantial evidence as is shown by the record." 66 So.2d at p. 663.
This decision is in line with many other decisions of this Court on the same point,[17] and disposes of this point contrary to appellant's contentions.
The last point made by the Grizzard group is that the financing and constructing of the proposed turnpike project violates the rights and privileges of the citizens of Florida guaranteed them by the Fourteenth Amendment of the Constitution of the United States and Section 12 of the Declaration of Rights of the Constitution of the State of Florida, F.S.A. This question is obviously premature. The bonds have not been sold, the proceeds are not yet available and the record fails to disclose that any person's vested rights have been or inevitably will be violated in the construction of this project. It must be assumed that, in the construction of this project, the requirements of the organic law and of the statutes of this State will be observed by this public Authority. When and if the rights of individuals under the Constitution and laws are violated, the processes of the law will be available to any injured parties.
The two other points raised by the Grizzard group have been carefully examined and are either without merit or have been disposed of in the discussion of the other points above.
The State presents four points. The first point which argues that the bonds proposed to be issued require the prior approval of the freeholders at an election under Section 6 of Article IX of the Florida Constitution, F.S.A., was raised and disposed of contrary to appellants' contention in the first turnpike case. This Court there held that such constitutional provision was inapplicable to revenue bonds issued by this Authority payable, as here, solely from tolls and other revenues. We reject this argument here for the same reasons we rejected it there.
The State argues in its second point that the outstanding Turnpike Revenue Bonds, Series of 1955, cannot lawfully be refunded prior to April 1, 1962, their first redemption date. The proposed Trust Indenture for the 1961 bonds contains a provision, as we have heretofore stated, that a portion of the proceeds derived from the sale of the bonds shall be used to redeem some $64,000,000 of outstanding 1955 bonds. The first redemption date is April 1, 1962. To accomplish this refunding so that the holders of this 1961 issue will have a first lien on the pledge of the revenues of the entire turnpike system, the Authority must have funds available by April 1, 1962 to pay off these old obligations. To accomplish this, the Trust Indenture requires a deposit with the 1955 Trustee of an amount in cash sufficient to retire the remaining outstanding bonds of such issue with accrued interest and expenses to April 1, 1962. The Act (Section 340.17) gives the Authority the power to issue revenue bonds for the purpose of such refunding and paying the cost of an additional project and the Trust Indenture provides that if the redemption premiums and accrued interest to the date of the redemption are irrevocably held by the Trustees "such bonds shall cease to be entitled to any lien, benefit or security under this Trust Agreement and the holders * * * of such bonds * * * shall have no right in respect thereof except to receive payment of the redemption price thereof." It is, therefore, obviously necessary to have the funds necessary to redeem the 1955 issue in the hands of the *21 Trustees prior to the redemption date, viz. April 1, 1962. We find no objection to the method in which the resolution and Trust Indenture propose to handle this matter. Moreover, the same problem has been before this Court in earlier cases and the general method of handling the matter as shown by this record has been approved.[18]
The State next argues that the Authority cannot legally combine Project No. 1 and Project No. 2 into one consolidated turnpike project. This question again concerns the exercise of business judgment and discretion on the part of the Authority. We think the most conclusive answer to this argument is found in the language of the act creating the Authority. While this act authorizes the Authority to build the turnpike in different segments, a careful study of the act reveals the legislative intent that, when the project is completed, it shall be operated as one project. Good business and common sense require such conclusion. On other occasions this Court has approved the combination of several related projects into one operation.[19]
The last contention of the State is that the Authority is not authorized to construct a part only of the turnpike project authorized to be constructed from the northern terminus of Project No. 1 to a point in Duval County. This point does not require extended discussion. Like the preceding point, the answer is found in the language of the legislative act itself. Moreover, in the first and second turnpike cases this Court had before it this same question and rejected it.
The Engineers argue that the Authority abused its inherent discretion by determining to extend the turnpike through Lake County. We approved the route through Lake County in the second turnpike case so that matter has long since been set at rest. Moreover, as we have heretofore stated, in this and the other cases, the exact location of the highway is one within the discretion of the Authority. The second contention of the Engineers is:
"Where it has not been alleged or proved necessary to acquire a right-of-way for the construction of a toll road because existing highways are inadequate to carry the necessary and projected traffic, and acquisition of the right-of-way will create irreparable and continuing damage to owners of orange groves through which said right-of-way will be taken, does not the validation of bonds to provide funds for such arbitrary taking, violate section 12 of the Declaration of Rights of the Florida Constitution, and the Due Process Clause of the Fourteenth Amendment to the Federal Constitution?"
It is obvious on the face of the above contention that the question is founded on a false premise. Moreover, it is not properly a matter for adjudication in these proceedings to validate an issue of revenue bonds.[20]
We conclude this opinion by repeating the observation made by Mr. Justice Thomas *22 in the first paragraph of the opinion of the Court in the first turnpike case:
"* * * this court is not remotely concerned with the policy inherent in the legislative act * * *, the wisdom of provisions for turnpikes being a matter solely within the province of the legislature. This court is now required only to review the order of the circuit court which validated the bonds, proposed to be issued for the construction of a link in the turnpike. * * * The pivotal question before us is whether the Florida State Turnpike Authority has acted within the power vested in that body by the legislature." [80 So.2d 339.]
We hold that on the record here the Authority has lawfully acted within the power granted it by the Legislature of this State.
The decree of the Circuit Court is therefore
Affirmed.
ROBERTS, C.J., and TERRELL, THOMAS and THORNAL, JJ., concur.
NOTES
[1] These parties, in addition to appealing from the final decree, also timely filed a joinder in the appeal of the State.
[2] The notice of appeal was filed September 28th, subsequent to the date a petition for rehearing was filed by the same parties. See infra notes 9 and 10.
[3] His ruling appears in the record as follows:

"* * * In the face of the Rule to Show Cause and in view of the fact that the hearing has been set for several weeks, as is reflected by the publication of the several notices to show cause, the Court is constrained to sustain the objection to a continuance and proceed with the hearing. The Motion to Dismiss on the part of Mr. Warren, of course, will be regarded as a protest against validation and will be regarded as an Answer setting up the matters with respect to which he has interposed Complaint. * * *."
[4] In particular, Section 75.07, Florida Statutes 1959, F.S.A.
[5] Appeals must be taken in twenty days instead of sixty. Times for filing of briefs are greatly shortened. The statute provides that the Supreme Court (where oral argument is requested) may set the case at the "earliest practicable date" and "shall give immediate consideration to said appeal". Any petition for rehearing must be filed in ten days instead of twenty, and, such appeals have priority on the docket of this Court over all other civil cases. Chapter 75, Florida Statutes 1959, F.S.A. Also see Florida Appellate Rules, Rule 4.3, 31 F.S.A.
[6] Granting or denying continuances are matters resting in the sound judicial discretion of the trial judge. See cases cited 3 Enc.Digest, Fla.Reports, Continuances, Sect. 1, et seq. (1953).
[7] All of the interested parties and respective counsel, except the attorney for the Engineers, were present.
[8] See footnote 2, supra.
[9] Thursby v. Stewart, 103 Fla. 990, 138 So. 742 (1931). 2 Fla.Jur. Appeals, Section 133 (1955). Thus, the filing of the answer was wholly unauthorized.
[10] Allen v. Town of Largo: Nevins v. Town of Largo, 39 So.2d 549 (Fla. 1949).
[11] Ch. 28128, Laws of Florida (1953). Original and amendatory acts now compiled in Florida Statutes as Chapter 340, F.S.A.
[12] The State of Florida v. Florida State Turnpike Authority, 80 So.2d 337 (Fla. 1955).
[13] Ch. 29634, Laws of Florida (1955). Section 340.03, Florida Statutes, F.S.A.
[14] State of Florida v. Florida State Turnpike Authority, 89 So.2d 653 (Fla. 1956). This project was abandoned by the State because of the depressed bond market and the inability of the State to sell the proposed issue of bonds at that time.
[15] This point is conceded by the Authority in the following excerpt from of its briefs:

"Section 7.16 of the Trust Indenture attempts nothing more than to limit the Authority's ability to give its consent to the construction of a competing road in the same traffic corridor with the Turnpike System. This section can not obligate the State Road Department nor can it commit the Bureau of Public Roads of the Federal Government to any course of action. Neither the Florida Statutes nor the Federal law requires the State Road Department or the Bureau of Public Roads to obtain the consent of the Turnpike Authority before building any state road or any Interstate Highway, competing or otherwise with the Turnpike System. This section is intended as a covenant to protect the bondholders against an indiscriminate act on the part of the Authority if, as and when its consent in a certain regard is sought by another public body."
[16] State ex rel. Ervin v. Cotney, 104 So.2d 346 (Fla. 1958); State v. Daytona Beach Racing and Recreational Facilities Dist., 89 So.2d 34 (Fla. 1956); State v. Board of Control, 66 So.2d 209 (Fla. 1953); Gate City Garage v. City of Jacksonville, 66 So.2d 653 (Fla. 1953); Panama City v. State, 93 So.2d 608 (Fla. 1957); Gwin, as Tax Collector v. City of Tallahassee, 132 So.2d 273 (Fla. 1961) and Sunny Isles Fishing Pier, Inc. v. Dade County, 79 So.2d 667 (Fla. 1955).
[17] Town of Riviera Beach v. State, 53 So.2d 828 (Fla. 1951); State ex rel. Robinson v. North Broward Hospital District, 95 So.2d 434 (Fla. 1957); Fort Pierce Gas Company v. City of Fort Pierce, 116 So.2d 418 (Fla. 1959). Cf. Sanibel-Captiva Taxpayers' Association v. County of Lee, 132 So.2d 334 (Fla. 1961).
[18] State v. City of Orlando, 82 So.2d 874 (Fla. 1955); State v. City of Melbourne, 93 So.2d 371 (Fla. 1957); State v. Jacksonville Expressway Authority, 93 So.2d 870 (Fla. 1957).
[19] State v. Florida State Improvement Commission, 71 So.2d 146 (Fla. 1954); State v. Florida State Improvement Commission, 48 So.2d 156 (Fla. 1950); Cf. State v. Town of River Junction, 125 Fla. 267, 169 So. 676 (1936); Hess v. City of Orlando, 133 Fla. 831, 183 So. 473 (1938); Rowe v. City of Fort Lauderdale, 142 Fla. 746, 196 So. 199 (1940); State v. City of Fort Myers, 156 Fla. 681, 24 So.2d 50 (1945).
[20] State v. City of Miami, 103 So.2d 185 (Fla. 1958); Miller v. City of St. Augustine, 97 So.2d 256 (Fla. 1957).