599 So.2d 1326 (1992)
STATE of Florida; Florida Department of Natural Resources; and Florida Department of Revenue, Appellants,
v.
H.G. LEAVINS, Jr., and Alice C. Leavins; Donnie Wilson; James T. McNeill; and Olan B. Ward, Appellees.
Nos. 90-2177, 90-2359, 90-2364.
District Court of Appeal of Florida, First District.
May 11, 1992.
*1328 Robert A. Butterworth, Atty. Gen., Joseph C. Mellichamp, III, Sr. Asst. Atty. Gen., Eric J. Taylor and Joseph Lewis, Jr., Asst. Attys. Gen., for appellant Dept. of Revenue.
Kenneth J. Plante, Gen. Counsel, C. Lynne Chapman, Asst. Gen. Counsel, Kelly Brewton, Asst. Gen. Counsel, Dept. of Natural Resources, for appellant Dept. of Natural Resources.
Frank J. Santry and George G. Rasky of Granger, Santry, Mitchell & Heath, Tallahassee, for appellees.
KAHN, Judge.
Appellants, in these three consolidated cases, challenge an order of the trial court which finds unconstitutional Chapter 89-432 and Chapter 89-175, Laws of Florida.
Appellees are holders of perpetual oyster harvesting leases pertaining to submerged lands in the Apalachicola Bay area. The leases provide that they are subject to the terms, conditions, reservations and restrictions in either Chapter 16178, Acts of 1933, Laws of Florida, or section 370.16, Florida Statutes (1953),[1] depending on the particular lease. The trial court found as a matter of fact, and we agree, that the leases, when construed with the statutory provisions incorporated by reference, have the following terms:
a. Their duration is perpetual.
b. Annual rent must be paid.
c. Cultivation must be provided so that at the end of 5 years (10 years for leases 547 and 551) there have been planted 200 barrels of cultch[2] per acre.
d. All oysters shall be culled as taken from the lease area.
e. All oysters smaller than 3" and all bedding shells shall be immediately replaced upon the area from which they were taken.
f. All half shells shall be returned from the place taken within 24 hours after removal.
g. The lease area must be marked by stakes or buoys on the boundaries.
h. Oysters produced on the lease must be marketed exclusively through premises of an oyster house holding a certificate of approval from the Florida State Board of Health [now HRS].
i. After the lease is issued, the lessee shall enjoy the exclusive use of the leased land.
j. All oysters and clams, shell and cultch grown or placed on the lease shall be the exclusive property of the lessee.
k. No taxes, assessments, or other licenses than those imposed by then-Ch. 370.16 (1953 or earlier) shall be levied or imposed on the lease or leased land.
l. After 10 years, the rental shall be not less than $1.00 per acre. Rental shall be assessed taking into consideration the value of the land as oyster- or clam-growing water bottoms, nearness to factories, transportation and other conditions adding value thereto. If the lessee is dissatisfied with the rental so fixed he can bring an action in circuit court to set the rent.
m. The leases are inheritable, transferrable, and subject to mortgage or pledge. Transfers are invalid until registered in the book of the state board of conservation *1329 [now Department of Natural Resources].
n. Anyone who shall wilfully carry or attempt to carry away oysters, shells, clams or cultch without the permission of the owner shall be guilty of a crime.
o. Anyone who gathers oysters between sunset and sunrise unless he has a light attached to his vessel violates the provisions of the section.
p. Closed seasons [between May 1st and Sept. 1st] apply to public beds but not private leases.
q. Although only hand tongs may be used on the public beds, a lessee may use any implements or appliances of his choosing subject to posting a bond to limit their use to leased ground.
r. Severance taxes [which were subsequently repealed] are imposed on oysters.
In 1989, the legislature enacted Chapter 89-432, a special act relating to Franklin County, Florida, and providing, in pertinent part, as follows:
It is unlawful for any person to operate a mechanized dredge or rake in Apalachicola Bay in Franklin County for the purpose of taking or removing oysters or clams. Any person who violates this section is guilty of a misdemeanor of the first degree, punishable by imprisonment or fine, or both, as provided by general law.
The 1989 Legislature also enacted Chapter 89-175.[3] Chapter 89-175 imposed various *1330 restrictions on the oyster industry. Some of the restrictions at issue are: the imposition of a harvesting license requirement in Section 17; imposition of a surcharge *1331 tax in Section 18; the repeal of the exemption of leased beds from the closed seasons in Section 19 and imposition of a per acre surcharge on the leases and new liability for abandoning or vacating a lease in Section 26.
The trial court, in its well-reasoned order, held both statutes unconstitutional. Appellees successfully argued that the special act violates the constitutional prohibition against impairing the obligation of contract,[4] and further that it is an unconstitutional special law pertaining to regulation of occupations which are regulated by state agency.[5] In their attack on Chapter 89-175, appellees claimed that the act violates the single subject requirement of the Florida Constitution,[6] is a prohibited special law regulating their occupation,[7] constitutes an impermissible classification of political subdivisions of the state,[8] and unconstitutionally impairs their oyster leases with the State of Florida.[9]
For the reasons set out in this opinion, we affirm the judgment of the trial court finding both of the challenged enactments unconstitutional, and enjoining the state and its agencies from enforcing these laws.

I. Chapter 89-432, Laws of Florida
Chapter 89-432 was passed by the legislature as a special or local law, with application only to Franklin County.[10] The act in question completely outlaws the use of any mechanized dredge or rake for the purpose of taking oysters in Apalachicola Bay. Appellees point directly to the language contained in section 370.16(16)(b), Florida Statutes (1953), and incorporated into their leases: "Lessees of bedding grounds shall have the right to use in such bedding grounds any implements, or appliances that they may desire."
We adopt the following portions of the trial court's order pertaining to impairment of appellees' contractual rights by Chapter 89-432:
7. Ch. 89-432, Laws of Florida (S.B. 1542) is a special act which prohibits the operation of mechanized dredges or rakes in Apalachicola Bay in Franklin County for the purpose of taking or removing oysters or clams. There is no genuine issue of material fact that plaintiffs each possess oyster leases containing a term which allows them to use on their bedding grounds any implements or appliances that they may desire.
8. The statute is, as a matter of law, unconstitutional and void because it violates Fla. Const. Art. I, Sec. 10 that `no law ... impairing the obligation of contract shall be passed.'
9. This court has already upheld this right by the entry of two temporary and two permanent injunctions in these proceedings.
10. The entitlement to use mechanical harvesting appliances is a valuable part of the rights of Plaintiffs under their contracts with the State of Florida. DNR stipulated in these proceedings that:
The use of dredges could allow the holders of leases to harvest oysters from the leasehold more quickly and less expensively. The savings in money could then be used to create more oyster habitat.
Additional Stipulation dated March 17, 1989.

*1332 11. The State, having agreed to contracts granting plaintiffs' rights to mechanically harvest their leases, cannot now impair those leases by passing a special act to take that right away. `It is axiomatic that subsequent legislation which diminishes the value of a contract is repugnant to our constitution.' Dewberry v. Auto-Owners Ins. Co., 363 So.2d 1077, 1080 (Fla. 1978). See also, Atlantic & Gulf R. Co. v. Allen, 15 Fla. 637 (1876); Folks v. Marion County, [121 Fla. 17] 163 So. 298 (1935); and In re Advisory Opinion to Governor, 509 So.2d 292 (Fla. 1987). As the Department of Natural Resources conceded in its memo in opposition to an earlier motion decided herein, even greater scrutiny should be applied to legislation impairing public contracts (those involving the State).
In approving this portion of the trial court's order, we must question the state's proffered interpretation of section 370.16(4)(a), Florida Statutes (1953).[11] Relying upon the 1953 Legislature's use of the phrase "such restrictions as shall herein be stated," the state argues that use of the word "shall" allows modification of, or addition to, the restrictions in these oyster leases by a subsequent act amending section 370.16. We need not, however, reach the validity of the state's novel interpretation, since we observe that the 1989 Legislature, the very same body that enacted Chapter 89-432, also reenacted the 36-year-old provision of section 370.16(16)(b) reserving to the holders of oyster leases the right to use any implements or appliances that they may desire with which to work their leases.[12]
The trial court also found Chapter 89-432 unconstitutional, as a matter of law, because it violates Article III, Section 11(a)(20) of the Florida Constitution, prohibiting special laws pertaining to regulation of occupations which are regulated by a state agency. According to the trial court: "The occupations of shellfishing and shellfish processing are pervasively and preemptively regulated by the State of Florida. The attempt by this local law to regulate the method by which oysters may be harvested in Apalachicola Bay is therefore unconstitutional."
We agree that shellfishing is in fact a regulated occupation. Chapter 370 of the Florida Statutes provides that the Department of Natural Resources is "charged with the administration, supervision, development and conservation of the natural resources of the state." § 370.013, Fla. Stat. (1989). Were this the end of the legislative empowerment to DNR, we might be inclined to agree with the state's position that DNR merely manages the marine resources of this state. Chapter 370 also provides, however, that the Division of Marine Resources of DNR shall have as its official duty the obligation "to regulate the operations of all fishermen and vessels of this state engaged in the taking of such fishery resources within or without the boundaries of such state waters." § 370.02(2)(a), Fla. Stat. (1989). The trial court in its order has painstakingly identified 15 statutory and 57 rule provisions regulating shellfishing and shellfish processing in this state. Accordingly, we reject the state's argument that shellfishing is not a regulated occupation.
The inquiry thus becomes whether Chapter 89-432 in fact acts to regulate an occupation already regulated by the state. Given Florida's unique position among the states as a repository of aquatic life and marine resources, our state legislature has a special interest in the protection and preservation of such resources for the general welfare of the state and its citizens. Thus we must determine whether this act is a permissible attempt by the legislature to regulate access to a resource, or whether it *1333 impermissibly impedes appellees' pursuit of their occupation.[13]
We find that the instant provision is similar to the law challenged in State v. Perkins, 436 So.2d 150 (Fla. 2d DCA 1983), rev. denied, 436 So.2d 100 (Fla. 1983). That case involved a challenge to Chapter 81-465, Laws of Florida, providing that: "No seine, gill net, or other net, except a common cast net, shall be set or used for the taking of food fish from the salt waters of Pinellas County within fifty yards of any dock or pier." Recognizing that Chapter 370 already provides for state regulation of the saltwater fisheries industry, the court nevertheless upheld the statute, finding that it merely served to govern access to marine resources in the Pinellas County area:
[I]t is well established that the right of property and fish in the saltwaters of the state is common to all people and cannot be claimed by any particular individuals. The people have a right to take fish from the salt waters subject to regulation imposed by the state for the benefit of the people of the state.
436 So.2d at 152.
Accordingly, we hold that Chapter 89-432 does not constitute an impermissible regulation of an occupation. Since the act does, however, impair appellees' valuable contract rights, and thereby diminishes the value of their leases, it may not stand. See Dewberry v. Auto Owners Insurance Co., 363 So.2d 1077 (Fla. 1978) (subsequent legislation which diminishes the value of a contract is repugnant to the Constitution and prohibited by Article I, Section 10, Florida Constitution).

II. Chapter 89-175, Laws of Florida

A. Single Subject Violation
The Act under review here is sweeping, to say the least.[14] In its order, the trial court identified, without limitation, the following subjects treated by the Act:
1. Protection from impact of gas and oil exploration and development;
2. Prohibition of leases for oil and gas exploration in South Florida;
3. Establishment of a coastal resources interagency management committee with responsibility for issues and resolution of conflict among state agencies in the implementation of the State Comprehensive Plan;
4. Statutes relating to injury or destruction of coral reefs;
5. Requirements of notification to the Legislature of coastal construction control lines;
6. Regulation of dumping litter in canals;
7. Requirement of placing litter receptacles in commercial facilities for boats;
8. Establishment of a multi-state compact dealing with environmental problems transcending state boundaries;
9. Establishment of a Coastal Spill Response Task Force;
10. Amendments to the law permitting private or public entities to remove dredge spoil material from State sovereignty lands;
11. Establishment of an Apalachicola Bay oyster harvesting license;
12. Establishment of an Apalachicola Bay oyster surcharge tax;
13. Establishment of requirements for monitoring shellfish cultivation in Apalachicola Bay;
14. Amendments to the law reducing the duration of permits for dredging river channels;

*1334 15. Requiring the Northwest Florida Water Management District to conduct a fresh water needs assessment of Apalachicola Bay;
16. Establishment of a $5.00 per acre lease surcharge for oyster leases;
17. Establishment of pilot programs for coastal shoreline erosion control;
18. Creation of the Florida Communities Trust, a non-regulatory agency to assist in implementation of local comprehensive plans;
19. Establishment of a community trust license plate and tax;
20. Establishment of environmental education in community colleges and universities;
21. Amendments to the Florida hunting license laws, including changes in fees for a bear stamp and a turkey stamp and establishing exemptions for veterans and disabled citizens;
22. Establishment of annual fees for commercial hunting preserves.
Article III, Section 6 of the Florida Constitution provides: "Every law shall embrace but one subject and matter properly connected therewith, and the subject shall be briefly expressed in the title."
The question in this case is whether the various subjects addressed by Chapter 89-175, ranging from prohibition of certain leases for oil and gas exploration in South Florida, to establishment of a 50 cents per bag surcharge on wholesalers of Apalachicola Bay oysters, to changing the fees for bear and turkey hunting stamps, have a "natural or logical connection." Chenoweth v. Kemp, 396 So.2d 1122 (Fla. 1981). The supreme court has recently reminded the Florida Legislature:
The purpose of this constitutional prohibition against a plurality of subjects in a single legislative act is to prevent `logrolling' where a single enactment becomes a cloak for dissimilar legislation having no necessary or appropriate connection with the subject matter. State v. Lee, 356 So.2d 276 (Fla. 1978). The act may be as broad as the legislature chooses provided the matters included in the act have a natural or logical connection. Chenoweth v. Kemp, 396 So.2d 1122 (Fla. 1981).
Martinez v. Scanlan, 582 So.2d 1167, 1172 (Fla. 1991).
The supreme court has accorded great deference to the legislature in the single subject area. The court has also applied a somewhat relaxed rule in cases where it found that the subjects of an act were reasonably related to an identifiable crisis the legislature intended to address. See Burch v. State, 558 So.2d 1, 2-3 (Fla. 1990) (Chapter 87-243, Laws of Florida, upheld where legislature includes within the preamble of the act specific findings concerning Florida's "crime rate crisis," and scope of measures required to combat such crisis); Smith v. Department of Insurance, 507 So.2d 1080 (Fla. 1987).[15] In the present case we observe that the legislature has not ostensibly addressed any crisis, but has attempted to bundle together the various matters encompassed by Chapter 89-175 under the rubric "an act relating to environmental resources." This phrase is so broad, and potentially encompasses so many topics, as to lend little support to the state's attempt to fend off a single subject challenge.
The challenged act cannot be sustained under the view espoused in Martinez v. Scanlan, supra. In that case, the court invalidated Chapter 90-201, the Comprehensive Economic Development Act of 1990. The court rejected the claim advanced by the state that the subjects of workers' compensation and international trade are each logically related to the topic of comprehensive economic development. The court looked at both the relationship of the various subjects to the topic of the act, and the relationship of the subject matters to one another:

*1335 In the instant case, however, the subjects of workers' compensation and international trade are simply too dissimilar and lack the necessary logical and rational relationship to the legislature's stated purpose of comprehensive economic development to pass constitutional muster.
582 So.2d at 1172.
We are unable to discern a logical interconnection between the various subject matters of Chapter 89-175. Although each individual subject addressed might be said to bear some relationship to the general topic of environmental resources, such a finding would not, and should not, satisfy the test under Article III, Section 6. If a purpose of the constitutional prohibition was, as observed by the court below, to insure, as nearly as possible, that a member of the legislature be able to consider the merit of each subject contained in the act independently of the political influence of the merit of each other topic, the reviewing court must examine each subject in light of the various other matters affected by the act, and not simply compare each isolated subject to the stated topic of the act.[16] Viewing Chapter 89-175 in this context, we affirm the trial court's holding that the act violates Florida's single subject requirement.

B. General Law or Prohibited Special Law?
The trial court, agreeing with the position taken by appellees, found that Chapter 89-175 violated Article III, Section 11(a)(20) (special law regulating occupations regulated by a state agency) and Section 11(b) (unreasonable classification in general law of local application) of the Florida Constitution. The trial court reached this conclusion as to the following portions of Chapter 89-175: Section 17 (requiring an Apalachicola Bay oyster harvesting license to harvest oysters from the Apalachicola Bay, requiring prerequisites to receive the license, providing license fees, providing for expenditure or distribution of the fees by DNR, and providing penalties); Section 18 (requiring wholesale dealers to pay a 50 cents surcharge on each bag of oysters taken from the Apalachicola Bay); and Section 19 (directing the Marine Fisheries Commission of DNR to consider establishing a new shellfish harvesting season in the Apalachicola Bay, directing the Marine Fisheries Commission to consider restricting the number of days harvesting is allowed on leaseholds, and requiring special activity licenses issued to harvest shellfish by dredge or other mechanical means from oyster leases in Apalachicola Bay, with five newly established preconditions for the issuance of such licenses).
We depart here from the trial court's reasoning, and hold that, despite its other infirmities, Chapter 89-175 does not violate Article III, Section 11.
Article III, Section 11(a)(20) prohibits, as discussed in Section I, supra, any special law or general law of local application pertaining to regulation of occupations which are regulated by a state agency. We have already determined that shellfishing and shellfish processing are regulated by the State of Florida. Thus we must determine whether Chapter 89-175 is a general law, as contended by the state, or a local law, as held by the trial court, and urged by appellees. If the act is a general law, the Article III, Section 11 prohibition concerning regulation of occupations is not pertinent. A general law must, however, also pass scrutiny under Article III, Section 11(b):

*1336 In the enactment of general laws on other subjects, political subdivisions or other governmental entities may be classified only on a basis reasonably related to the subject of a law.
A general law is defined as a law that operates uniformly within the state, uniformly upon subjects as they exist within the state, or uniformly within a permissible classification. Department of Business Regulation v. Classic Mile Inc., 541 So.2d 1155 (Fla. 1989). A law need not be universal in application to be a general law, so long as it is one of general import affecting directly or indirectly all the citizens of the state. Cantwell v. St. Petersburg Port Authority, 155 Fla. 651, 21 So.2d 139 (Fla. 1945) (upholding, as a valid general law, a statute authorizing the Florida Railroad Commission to grant franchises to maintain ferries and other modes of transportation over, under, or across bays, inlets, bayous, lagoons, or sounds, bordering on or connected with the Gulf of Mexico, despite the claim that only a portion of the state's counties actually touch the Gulf). The supreme court in State v. Fla. State Turnpike Authority, 80 So.2d 337 (Fla. 1955), upheld an act providing funding and construction of a turnpike traversing only a few counties in southeast Florida, as a proper general law which would promote the important state purpose of facilitating the flow of traffic northward and southward throughout the state.
General laws may apply to specific areas if their classification is permissibly and reasonably related to the purpose of the statute. Department of Legal Affairs v. Sanford-Orlando Kennel Club, 434 So.2d 879 (Fla. 1983). Uniformity of operation does not require that a law operate upon every person in the state, but that every person brought within the circumstances provided for is fairly and equally affected by the law. Id. at 881.
The trial court, relying upon Department of Business Regulation v. Classic Mile Inc., supra, concluded that the descriptive technique utilized in Chapter 89-175, ostensibly the references to the Apalachicola Bay, "is in fact geographical (a clearly local law) and thus for identification." In Classic Mile, the supreme court struck down a statute authorizing simulcast horse races and pari-mutuel wagering thereon based on a description which could only apply to Marion County. We believe Classic Mile should be distinguished. First, the act in that case applied only to Marion County and thus, directly intruded upon the Article III, Section 11 prohibition concerning classification of "political subdivisions or other governmental entities." Equally important, there is no suggestion that pari-mutuel wagering in one county is comparable in terms of import and impact statewide with the shellfishing industry centered upon the Apalachicola Bay. Apalachicola Bay is denominated as an area of critical state concern pursuant to section 380.0555, Florida Statutes (1989). It has also been variously recognized as a Natural Estuarine Sanctuary, a Florida Aquatic Preserve, an Outstanding Florida Water, and is documented to produce some 90% of this state's commercial oyster harvest. The seafood industry is an important and distinctive industry in Florida. Any classification here is merely geographical, and not political. The challenged aspects of the law apply uniformly to anyone desirous of access to the marine resources in Apalachicola Bay. The protection of valuable marine resources is a valid, and indeed inescapable, exercise of the state's police power. See Moviematic Ind. Corp. v. Bd. of County Comm'rs of Metro. Dade County, 349 So.2d 667, 669 (Fla. 3d DCA 1977) ("preservation of the ecological balance of a particular area is a valid exercise of the police power as it relates to the general welfare"); State v. Hodges, 506 So.2d 437 (Fla. 1st DCA 1987) (regulation of shrimping industry is a valid exercise of the state's police power), rev. denied, 515 So.2d 229 (Fla. 1987); Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla. 1981) (protection of environmentally sensitive areas is a legitimate concern within the police powers of the state), cert. denied sub nom. Taylor v. Graham, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981). The geographical classification inherent in the act will not, standing alone, render the act a prohibited *1337 law of local application, any more than do Florida's pervasive regulations concerning the citrus industry, in light of the incontestable climatic evidence that a majority of this state's counties cannot support a commercial citrus crop. See Chapter 601, Florida Statutes (1989).
Since Chapter 89-175 is a general law, it does not violate Article III, Section 11(a)(20) of the Florida Constitution. Although Sections 17, 18 and 19 of Chapter 89-175 indulge in a geographical classification, they do not violate Article III, Section 11(b) of the Florida Constitution because they do not classify political subdivisions or other governmental entities, and are reasonably related to the valid exercise of the state's police power.

C. Impairment of Contract
The court's holding, supra, that the special act impairs appellees' leases with the state, is not controlling as to our examination of the impact of Chapter 89-175 upon these same leases. The special act absolutely prohibited, without exemption or condition, appellee's right to do that which was specifically reserved to them under the terms of the oyster leases. An analysis of the challenged sections of Chapter 89-175 is required in order for us to determine whether the act has an impact of constitutional dimensions upon appellees' protected rights.
The trial court invalidated Sections 17, 18, and 19, described supra, as well as Section 26, providing a per acre surcharge on leases in order to provide a mechanism to have financial resources immediately available for cleanup and rehabilitation of abandoned or vacated lease sites. The surcharge imposed under Section 26 is $5.00 per acre and would be levied until a total of $30,000 has been collected. After that point, no surcharge would be levied unless the balance of cumulative surcharges held in segregated funds fell below $20,000.
Section 17 of the act requires an Apalachicola Bay harvesting license. Chapter 370, as amended by this section, would prohibit any person from harvesting oysters from the Apalachicola Bay without a valid oyster harvesting license issued by DNR. Any economic burden imposed by Section 17 is thus imposed upon an individual oysterman and not upon the leases in question. The value of the leases cannot be said to have been impaired, since anyone wishing to take oysters from Apalachicola Bay must have the license, and such license requirement does not disproportionately affect appellees' rights to plant, cultivate, and harvest oysters, and to reap the profit therefrom. Our review of the leases, and the statutes incorporated in these leases, does not lead us to conclude that the state is now absolutely prohibited from incidental regulation, through licensing, of those who work the leases.
Under Section 18 of Chapter 89-175, the state seeks to collect a 50 cents per bag surcharge on oysters taken from the Apalachicola Bay. By the clear terms of the act, the surcharge is to "be paid by the wholesale dealer first receiving, using, or selling the oysters after harvesting." The bag surcharge is thus a tax imposed upon wholesalers, and does not affect any property rights appellees' claim in their oyster leases. The bag surcharge does not, in and of itself, offend the constitution.
Sections 19 and 26, however, impair the appellees' leases in violation of Article I, Section 10 of the Florida Constitution. See Dewberry v. Auto-Owners Ins. Co., supra. Section 19 impacts oystermen in Apalachicola Bay in at least two ways. It directs the Marine Fisheries Commission to consider a two month closed season on Apalachicola Bay shellfish harvesting and also to consider restricting harvesting on oyster leases to the same days of the week as harvesting is allowed on public beds in the bay. This section also imposes certain requirements on the special activity licenses required by those oystermen who wish to use mechanical harvesting devices in the bay.[17]
*1338 As previously observed, these leases reserve unto the lessees the right to use any implements or appliances that they may desire in harvesting oysters.
Among the statutory provisions incorporated in these leases, section 370.16(15), Florida Statutes (1953), provides:
No person may take, gather or catch oysters on the natural reefs of this state, or have such oysters in his possession, for sale between the first day of May and the first day of September of each year, except from private leased or granted grounds, or artificial beds of riparian owners, except as otherwise provided in this section. (e.s.)
The law previously incorporated in the lease contracts established that the leases are exempt from closed seasons. Section 19 attempts to take away that right and diminishes the value of the contracts in violation of Article I, Section 10.
Section 19 also impairs the contract right of the leaseholders to use mechanical dredges by restricting the hours that a mechanical harvesting device can be used, restricting the number of dredges or scrapes per lease, requiring the leaseholders to telephonically notify the Division of Law Enforcement and the Division of Marine Resources at least 48 hours prior to the dredging, and requiring that a Marine Patrol officer be present while the dredging occurs.
Section 26 impairs the contract by imposing a per acre surcharge tax on the leased bottom where none has been applied before. The provision also allows the department to recover from persons abandoning or vacating the lease all sums owed or expended from the fund. As the trial court correctly stated in its order:
The law previously incorporated in the lease contracts set forth circumstances under which leases could be abandoned or vacated and no such liability was imposed.
26. The law incorporated into their leases contained a provision which said:
No taxes, assessments or other licenses, other than those imposed in this chapter shall be levied or imposed on the leases or leased lands, but the annual rental exacted and paid shall be held and considered all that can or shall be exacted by the state or county, subordinate political corporations, or municipalities.[18]
See, e.g., Ch. 375.04, Fla. Stat. (1941).
27. Thus the 1989 Statutory amendments imposing the new licenses, taxes and assessments impair plaintiffs' previously established contract rights.
We agree with the trial court and find that Sections 19 and 26 impair the lease contracts in violation of Article I, Section 10, Florida Constitution.
Accordingly, the effect of the trial court's order finding Chapter 89-432 and *1339 Chapter 89-175 unconstitutional is affirmed under the reasoning of this opinion.
SHIVERS and ZEHMER, JJ., concur.
NOTES
[1] Chapter 28145, Acts of 1953, Laws of Florida.
[2] Cultch is gravel or crushed shells to which oyster spawn may adhere.
[3] The title of Chapter 89-175 reads as follows:

An act relating to environmental resources; amending s. 206.9935, F.S.; revising the caps for the Florida Coastal Protection Trust Fund; amending s. 376.11, F.S.; providing for expenditures of interest earned from investments of the trust fund; authorizing additional uses of the fund; providing legislative intent; amending s. 253.61, F.S.; specifying additional lands not subject to lease; amending ss. 377.24 and 377.242, F.S.; prohibiting permits for drilling and associated construction for exploration or production of oil, gas, or other petroleum products, in a specified area; creating ss. 380.31, 380.32, and 380.33, F.S.; establishing the Coastal Resources Interagency Management Committee; providing duties, responsibilities, organization, and staff; amending s. 380.0558, F.S.; providing that damages recovered for injury to coral reefs that otherwise would be deposited into the Internal Improvement Trust Fund be deposited into the Florida Area of Critical State Concern Restoration Trust Fund; amending s. 253.04, F.S.; authorizing the Department of Natural Resources to develop a schedule to assess penalties for damage to coral reefs; amending s. 161.053, F.S.; extending the deadline for the reestablishment of coastal construction control lines; amending s. 403.413, F.S.; prohibiting dumping litter in canals; providing penalties; creating s. 403.4135, F.S.; requiring litter receptacles at certain commercial facilities; creating s. 380.28, F.S.; authorizing execution of the South Atlantic and Gulf States Coastal Protection Compact; providing form and substance of the compact; providing findings, purposes, and reservations of powers; providing for an effective date; providing for creation of a commission; providing powers, duties, organization, and operation of the commission; reserving certain powers to the states; providing for payment of expenses of the commission; providing for withdrawal from the compact; requiring an annual report; providing for appointment of Florida's members of the commission; authorizing examination of accounts by the Department of Banking and Finance; providing for an advisory committee; creating the Spill Response Task Force; providing for appointments; providing for staff; providing duties of the Task Force; providing for public notice of meetings; amending s. 253.03, F.S.; authorizing the board of trustees to give away spoil material under certain conditions; amending s. 370.06, F.S.; supplying definitions; requiring an Apalachicola Bay oyster harvesting license to harvest oysters from the Apalachicola Bay; providing a prerequisite to receiving the license; providing license fees; providing for expenditure or distribution of the fees by the Department of Natural Resources; providing penalties; amending s. 370.07, F.S.; providing a definition of `bag'; requiring wholesale dealers to pay a 50-cent surcharge on each bag of oysters taken from the Apalachicola Bay; providing responsibilities of the Department of Revenue; providing for expenditure or distribution of the fees by the Department of Natural Resources; requiring certain wholesale dealers to notify the Division of Law Enforcement of temporary business sites; amending s. 370.16, F.S.; providing for monitoring of planting activities on shellfish grants or leaseholds; authorizing the issuance of aquaculture leases in Franklin County; providing aquaculture lease restrictions; directing the Marine Fisheries Commission to consider establishing a new shellfish harvesting season in the Apalachicola Bay; requiring the Department of Natural Resources to monitor the impacts of the new season, if changed; directing the Marine Fisheries Commission to consider restricting the number of days harvesting is allowed on shellfish grants or leaseholds; creating the Apalachicola Bay Conservation Trust Fund; identifying proceeds to be deposited into the fund; prohibiting future use of dredges or implements other than hand tongs for shellfish harvesting in all areas of the Apalachicola Bay; establishing conditions of special activity licenses issued to harvest shellfish in the Apalachicola Bay by dredge or other means; amending s. 403.816, F.S.; limiting permits for dredging river channels to five years; amending s. 403.921, F.S.; limiting permits for dredging river channels to 10 years; directing the Northwest Florida Water Management District to arrange for an assessment of the freshwater needs of the Apalachicola Bay; providing for a coastal shoreline erosion control pilot project; amending ss. 253.01 and 270.22, F.S.; providing for deposit of revenues from certain aquaculture leases into the Marine Biological Research Trust Fund of the Department of Natural Resources, rather than the Internal Improvement Trust Fund; providing for the use of funds from shellfish-related aquaculture leases; amending s. 253.71, F.S.; revising provisions relating to aquaculture lease contracts; providing for a surcharge; eliminating a bond requirement; providing for cultivation guidelines; amending s. 370.16, F.S.; providing for increased rates for shellfish leases; providing for a surcharge for certain purposes; providing for deposit of shellfish lease rental fees; deleting provisions relating to taxes and licenses collected by the Division of Marine Resources of the department; creating part III of chapter 380, F.S., the `Florida Communities Trust Act'; providing legislative findings and intent; providing definitions; creating the Florida Communities Trust; providing for membership and expenses; providing for meetings, quorum, and voting; providing for support services; providing powers; providing for development, review, and approval of projects; providing for first-year duties of the Department of Community Affairs; providing for conditions of grants and loans; creating the Florida Communities Trust Fund; providing for an annual report; providing for corporate existence; providing for application to other laws; providing for construction; creating s. 320.08065, F.S.; providing for communities trust license plates; providing for fees and distribution thereof; amending s. 229.8055, F.S.; expanding the environmental education program to provide such education in community colleges and state universities; requiring the Commissioner of Education, the Board of Regents, and the State Board of Community Colleges to administer the program; requiring the Department of Education to disseminate information regarding environmental education for adults to the school districts; creating an Office of Environmental Education within the Office of the Commissioner of Education to develop a formal environmental education program; providing for a Coordinator of Environmental Education and specifying duties thereof; amending s. 229.8058, F.S.; creating the Advisory Council on Environmental Education within the Legislature; providing membership and authorization for the council to employ staff; transferring certain equipment and materials to the council; providing responsibilities of the Advisory Council on Environmental Education; directing the Governor to administer a grant program for environmental education; authorizing certain organizations and projects to be eligible for the grants; creating the Interagency Environmental Education Coordinating Committee to coordinate the environmental education programs of certain state agencies and water management districts; providing for appointments; providing for payment of per diem and travel expenses; providing for regular meetings of members and staff of specified entities; creating the Save Our State Environmental Education Trust Fund; authorizing the Executive Office of the Governor to establish a nonprofit support corporation for certain purposes; requiring an annual audit of the records of the corporation; exempting from public records requirements information in the audit report; providing for future legislative review of such exemption; saving s. 229.8058, F.S., from repeal; providing for future abolition and legislative review of the Advisory Council on Environmental Education and the Interagency Coordinating Committee for Environmental Education; providing for the Advisory Council on Environmental Education to propose projects to the Governor and Cabinet for approval; providing for the Governor and Cabinet to act on such recommendations within a specified time; providing additional positions; providing appropriations; providing for future review and repeal; providing for the application of scheduled repeal; amending s. 372.561, F.S.; providing for certification by any branch of the United States Armed Forces or the United States Social Security Administration to receive a permanent hunting and fishing license for certain totally and permanently disabled persons; amending s. 372.57, F.S.; providing that the turkey stamp used for hunting need not bear the name of the person to whom it is issued; revising language with respect to certain nonresident hunting licenses; providing fees; authorizing the Game and Fresh Water Fish Commission to designate certain free fishing days; amending s. 372.571, F.S.; conforming to the act; amending s. 372.662, F.S.; providing for a commercial hunting preserve license; providing a fee; providing effective dates.
[4] Art. I, § 10, Fla. Const.
[5] Art. III, § 11(a)(20), Fla. Const.
[6] Art. III, § 6, Fla. Const.
[7] See supra, note 5.
[8] Art. III, § 11(b), Fla. Const.
[9] See supra, note 4.
[10] Article III, Section 10 of the Constitution provides the mechanism for enactment of "special" laws. Article X, Section 12(g) of the Constitution defines "special" law to mean a special or local law. A statute relating to particular persons or things or other particular subjects of a class is considered under the Florida Constitution to be a special law. State ex rel. Gray v. Stoutamire, 131 Fla. 698, 179 So. 730 (1938). A local law, or a general law of local application, is a statute relating to particular subdivisions or portions of the state or to particular places of classified localities. Id.
[11] "All leases made under the provisions of this Chapter, shall begin on the day executed, and shall continue in perpetuity under such restrictions as shall herein be stated."
[12] This provision is found in Chapter 89-175, Sec. 19, Laws of Florida, which is itself a subject of appellees' challenge. Although Chapter 89-175 reserved to lessees the right to use implements or appliances of their choosing, it attempted to place substantial restrictions upon this use by the requirement of "special activity licenses." Infra, IIC.
[13] As to this particular point on appeal, the efficacy of the prohibition of mechanical dredges as a means of accomplishing the legislature's stated purpose is not at issue. The question is really whether the act facially intrudes into the prohibited area of regulation of an occupation. We have not ignored the following stipulation made by DNR in these proceedings: "The use of dredges could allow the holders of leases to harvest oysters from the leasehold more quickly and less expensively. The savings in money could then be used to create more oyster habitat."

This stipulation does not aid in resolution of the question of whether prohibition of dredges constitutes impermissible regulation of an occupation.
[14] See title, supra note 3.
[15] The trial court also suggested in its order that a different rule might apply to "an omnibus revision regarding a legislative topic like insurance or tort reform where greater latitude might be justified," citing State v. Lee, 356 So.2d 276 (Fla. 1978). The present act does not purport to be an omnibus revision.
[16] The dissenting opinion of Chief Justice Shaw, concurred in by Justices Barkett and Kogan, in Burch v. State, supra, is instructive:

[T]he matters included in an act must bear a logical and natural connection, and must be germane to one another. In my view, it will not suffice to say that all of the act's provisions deal with crime prevention or control.
.....
As noted in Bunnell v. State, 453 So.2d 808 (Fla. 1984), the constitution requires a `cogent relationship' among sections of an act in order to avoid unconstitutionality.
Burch v. State, 558 So.2d 1, 4 (Fla. 1990) (Shaw, J., dissenting).
[17] Such special activity licenses must, under Chapter 89-175, Section 19, include at least the following conditions:

1. The use of any mechanical harvesting device other than ordinary hand tongs for taking shellfish for any purpose from public shellfish beds in Apalachicola Bay shall be unlawful.
2. The possession of any mechanical harvesting device on the waters of Apalachicola Bay from 5:00 p.m. until sunrise shall be unlawful.
3. Leaseholders or grantees shall telephonically notify the Division of Law Enforcement and the Division of Marine Resources no less than 48 hours prior to each day's use of a dredge or scrape in order to arrange for a Marine Patrol officer to be present on the lease or grant area while a dredge or scrape is used on the lease or grant. Under no circumstances may a dredge or scrape be used without a Marine Patrol officer present.
4. Only two dredges or scrapes per lease or grant may be possessed or operated at any time.
5. Each vessel used for the transport or deployment of a dredge or scrape shall prominently display the lease or grant number or numbers, in numerals which are at least twelve inches high and six inches wide, in such a manner that the lease or grant number or numbers are readily identifiable from both the air and the water. The department shall apply other statutes, rules, or conditions necessary to protect the environment and natural resources from improper transport, deployment, and operation of a dredge or scrape. Any violation of this paragraph or of any other statutes, rules, or conditions referenced in the special activity license shall be considered a violation of the license and shall result in revocation of the license and forfeiture of the bond submitted to the department as a prerequisite to the issuance of this license.
[18] Chapter 89-175, Section 26 repealed this provision.