731 So.2d 21 (1999)
OCALA BREEDERS' SALES COMPANY, INC., a Florida Corporation and the State of Florida, Department of Business and Professional Regulation, Division of Pari-Mutuel Wagering, Appellants,
v.
FLORIDA GAMING CENTERS, INC., d/b/a Ocala Jai Alai, Appellee.
No. 97-4783.
District Court of Appeal of Florida, First District.
March 3, 1999.
Rehearing Denied April 14, 1999.
*22 Daniel S. Pearson, William F. Hamilton and Linda Collins Hertz of Holland & Knight, LLP, Miami, for Appellants.
William P. Cagney, III, of William P. Cagney, III, P.A., Miami and James S. Alves of Hopping, Green, Sams & Smith, P.A., Tallahassee, for Appellee.
PADOVANO, J.
At issue in this appeal is the constitutionality of section 550.615(9) Florida Statutes, which enables one thoroughbred horse breeder operating within the state to obtain an exclusive license to conduct parimutuel wagering at its sales facility. The trial court held that the statute is unconstitutional because it is a special law enacted in the guise of a general law, and because the classifications that determine entitlement *23 to the license violate the constitutional guarantee of equal protection of the law. We agree on both points and affirm.
Ocala Breeders Sales Company, Inc. operates a thoroughbred horse sales facility in Marion County, where it has conducted thoroughbred horse sales for twenty-four years. In addition to the permits necessary to sell and race thoroughbred horses, Ocala Breeders obtained a license under section 550.615(9) to conduct intertrack wagering. Florida Gaming Centers, Inc., operates the Ocala Jai Alai Fronton under a license to conduct pari-mutuel wagering in Marion County. The parties are now aligned on opposite sides of a constitutional issue, but the underlying controversy involves the financial impact of intertrack wagering.
As its name suggests, intertrack wagering is a form of pari-mutuel wagering in which the patrons at one racetrack or fronton can bet on a race or event taking place at another. The patrons in the remote location are allowed to place bets on the televised events occurring at the host location, and the proceeds are split according to a statutory formula. Intertrack wagering is available only at a licensed parimutuel wagering facility and is generally not authorized in other remote facilities.
Section 550.615(9), Florida Statutes (Supp.1996), extends intertrack wagering beyond pari-mutuel wagering facilities by allowing remote betting at a facility operated by a thoroughbred horse breeder. The statute requires the Division of Pari-Mutuel Wagering to issue an intertrack wagering license to one thoroughbred horse breeder based on the following criteria:
(9)(a) Upon application to the division on or before January 31 of each year, any quarter horse permit holder that has conducted at least 15 days of thoroughbred horse sales at a permanent sales facility for at least 3 consecutive years, and conducted at least one day of nonwagering thoroughbred racing, with a purse structure of at least $250,000 per year for 2 consecutive years prior to such application, shall be issued a license to conduct intertrack wagering ... provided that no more than one such license may be issued.
The possibility that more than one applicant will claim entitlement to the license is addressed in the next section of the statute, which the parties have aptly referred to as the tiebreaker provision.
(b) If more than one permit holder applies, the division shall determine which permit holder shall be granted the license. In making its determination, the division shall consider the length of time the permit holder has been conducting thoroughbred horse sales in this state, the length of time the applicant has had a permanent location in this state, and the volume of sales of thoroughbred horses in this state, giving the greater weight to the applicant that meets these criteria.
Among the other provisions of the statute, only section (e) is material to the issues presented here. Section (e) allows the holder of a quarter horse racing permit to qualify for a license to conduct intertrack wagering even if grounds exist to revoke the permit.
Ocala Jai Alai challenged the constitutionality of section 550.615(9) in a declaratory judgment suit in the circuit court.[1] When the pleadings were closed, Ocala Jai Alai presented the constitutional issue to the court on a motion for summary judgment. In support of the motion, Ocala Jai Alai advanced two separate but related arguments: (1) the statute is invalid as a special law because it creates a class that is closed to all but one prospective licensee; *24 and (2) the statute violates the right to equal protection of the law, because the criteria for obtaining a license bear no reasonable relationship to the object of the law.
On December 5, 1997, the trial court rendered a final summary judgment declaring section 550.615(9) unconstitutional. Based on the undisputed facts presented on the motion for summary judgment, the court found that Ocala Breeders was the only horse breeder conducting at least fifteen days of thoroughbred horse sales for at least three years, and the only such breeder with a permanent sales facility. The court also found that Ocala Breeders is the only horse breeder that had ever applied for or obtained a license to conduct nonwagering thoroughbred racing. Finally, the court found that, although Ocala Breeders holds a quarter horse racing permit, it had never used the permit to conduct live quarter horse racing. The failure to conduct live racing is a ground for revoking a quarter horse permit, but, as section 550.615(9)(e) provides, it does not disqualify the holder of a quarter horse permit from obtaining a license to conduct intertrack wagering.
These facts led the trial court to conclude that the statutory classification in section 550.615(9) is based on criteria that only Ocala Breeders could ever meet. As a matter of law, the court determined that the statutory criteria for obtaining an intertrack wagering license were arbitrary and not related to a legitimate public purpose. The court held that the statute is a special law enacted as a general law and that it violates the right to equal protection of the law. Ocala Breeders then filed this appeal.
A trial court decision on the constitutionality of a state statute presents an issue of law that is reviewed by the de novo standard of review. The appellate court is not required to defer to the judgment of the trial court. Although trial court decisions are presumed to be correct, there is also a strong presumption in the law that a state statute is constitutionally valid. In re Estate of Caldwell, 247 So.2d 1 (Fla.1971). Florida appellate courts have resolved these conflicting presumptions by deferring to the legislature in the enactment of the law. When a trial court has declared a state statute unconstitutional, the reviewing court must begin the process of appellate review with a presumption that the statute is valid. See State v. Slaughter, 574 So.2d 218 (Fla. 1st DCA 1991).
We need not defer to the trial court, however, to conclude that section 550.615(9) is a special law enacted in the guise of a general law. The criteria for awarding the one state license that is available under the law are drawn so narrowly that they could only be applied, now or in the future, to Ocala Breeders. Because the statutory class of potential licensees is effectively closed to only one thoroughbred horse breeder, the statute should have been enacted as a special law.
Special laws can operate in a limited geographic area within the state or they can regulate the conduct of a limited class of persons within the state. In this respect, they differ from general laws. As the supreme court explained in State ex rel. Landis v. Harris, 120 Fla. 555, 562-63, 163 So. 237, 240 (1934):
[A] special law is one relating to, or designed to operate upon, particular persons or things, ... or one that purports to operate upon classified persons or things when classification is not permissible or the classification adopted is illegal ...; a local law is one relating to, or designed to operate only in, a specifically indicated part of the State ..., or one that purports to operate within classified territory when classification is not permissible or the classification is illegal.... (citations omitted).
See also Dept. of Bus. Reg. v. Classic Mile, Inc., 541 So.2d 1155 (Fla. 1989).
Special laws are subject to procedural requirements that do not apply to *25 general laws. A special law affecting only one county or district can be properly enacted only if the legislature provides notice of its intention to enact the law, or if the proposed law has been approved by a vote of the electors in that county or district. These procedural requirements are set out in the Florida Constitution in the following language:
No special law shall be passed unless notice of intention to seek enactment thereof has been published in the manner provided by general law. Such notice shall not be necessary when the law, except the provision for referendum, is conditioned to become effective only upon approval by vote of the electors of the area affected.
Art. III, § 10 Fla. Const. (1968)
A general law is one that "operates universally throughout the state, uniformly upon subjects as they may exist throughout the state, or uniformly within a permissible classification." See Classic Mile, supra, at 1157; State ex rel. Landis, supra. This Court has explained that "[u]niformity of operation does not require that a law operate upon every person in the state, but that every person brought within the circumstances provided for is fairly and equally affected by the law," and that "[g]eneral laws may apply to specific areas if their classification is permissibly and reasonably related to the purpose of the statute." See State, Dept. of Natural Resources v. Leavins, 599 So.2d 1326, 1336 (Fla. 1st DCA 1992); art. III, § 11(b), Fla. Const.
The legislature has broad discretion to establish statutory classification schemes in general laws. If a classification bears a reasonable relationship to the purpose of the statute and is "based upon proper distinctions and differences that inhere in or are peculiar or appropriate to a class," the statute is a valid general law. See Classic Mile at 1157; see also Dept. of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879 (Fla.1983). However, a statute that employs an arbitrary classification scheme is not valid as a general law. See Classic Mile at 1157. The legislature cannot enact a special law in the guise of a general law, because that would violate the procedural requirements of Article III, Section 10 of the Florida Constitution.
Whether a law is special or general depends in part on whether the class it creates is open. If it is possible in the future for others to meet the criteria set forth in the statute, then it is a general law and not a special law. See Biscayne Kennel Club, Inc. v. Fla. St. Racing Comm'n, 165 So.2d 762 (Fla.1964); Dept. of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879 (Fla.1983); Summersport Enterprises, Ltd. v. Pari-Mutuel Comm'n, 493 So.2d 1085 (Fla. 1st DCA 1986); Classic Mile, supra. This test applies even if only one entity currently qualifies under the statute and even if the House and Senate members voting on the bill were aware that it would benefit only one specific entity. See Sanford-Orlando Kennel Club; Summersport.
Section 550.615(9) presently applies only to Ocala Breeders but, by the precedents we have cited, that alone does not make it a special law. The critical problem with the statute is that it could never be applied to any other potential licensee. Although it is possible that another horse breeder could meet the general qualifications for a license to conduct intertrack wagering, no other horse breeder could ever obtain the single license available, because Ocala Breeders would always prevail on the application of the tiebreaker provisions of the statute.
According to section 550.615(9)(b), if more than one applicant qualifies, the Division must award the license based on: (1) the length of time the applicant has conducted thoroughbred horse sales in this state; (2) the length of time the applicant has had a permanent location in this state; and, (3) the volume of sales of thoroughbred horses in this state. Ocala Breeders *26 is presently the only horse breeder conducting thoroughbred horse sales in this state and the only such breeder with a permanent sales facility. It follows that, as long as Ocala Breeders remains in business as a horse breeder, it will always prevail on the first two of the three statutory tiebreaker criteria.
The tiebreaker provision in section (b) is inseparable from the provisions of section (a) outlining the requirements for the license. Section (a) provides that the Division of Pari-Mutuel Wagering "shall" issue a license to an applicant meeting all of the criteria, but then it states that "no more than one such license shall be issued." Nothing in section (a) explains the course of action the Division should take if two or more applicants meet the criteria for a license and if they each claim entitlement to the license under the mandatory language of the statute. Hence, we conclude that the tiebreaker provision in subsection (b) is an essential feature that cannot be construed in isolation from the rest of the statute.
We also agree with the trial court that section 550.615(9) violates the right to equal protection of the law. As the trial court held, the qualifications for obtaining a license are not all rationally related to the object of the legislation. On the contrary, some of the requirements of the statute appear to have no arguable bearing on its purpose. Consequently we conclude that the statute violates the basic right to equal protection of the law guaranteed by Article I section 2 of the Florida Constitution.
The legislature may set classifications within a general law, but any such classification must bear a reasonable relationship to the primary purpose of the law. The decision of the supreme court in West Flagler Kennel Club, Inc., v. Florida State Racing Commission, 153 So.2d 5 (Fla. 1963) is instructive on this point. In that case, the court declared invalid a law allowing the transfer of harness racing permits. The statute allowed the holder of a harness racing permit which had been issued after 1946 and used within the last five years before the law went into effect, to conduct horse racing in Broward County. The court held that there was no relationship between these qualifications and the purpose of the law, because the "existing permits are described and distinguished on the basis of such factors as time of issuance and time of operations conducted." The court went on to say:
Appellees do not attempt to demonstrate a reasonable relation between these factors and the primary purpose of the act, which was to provide for harness racing in Broward County on certain legislatively prescribed conditions, and we perceive none. Obviously, then, the effort is not to make the act applicable to a permit or permits of like kind, differing from others in some material respect, but instead the descriptive technique is employed merely for identification rather than classification. Upon analysis we think this legislation must be regarded as an enactment granting to certain permit holders, designated in terms not susceptible of generic application now or in the future, the right to conduct harness racing in Broward County upon compliance with its conditions.
153 So.2d at 8.
The court restated the rule in Hialeah Race Course, Inc. v. Gulfstream Park Racing Association, 245 So.2d 625 (Fla. 1971), and added that a statutory criterion is not valid merely because it appears to promote the objective of the law. The statute at issue in Hialeah allowed the racetrack with the highest revenues to select the most favorable racing dates within the season for the next year. Over time, this proved to allow one racetrack a perpetual advantage, because, as a practical matter, the track with the most favorable racing dates would always be the track that produced the most revenue. The court said that the equality of opportunity provided by the statute is "more apparent than *27 real." Id. at 629. Because that statute offered an unfair advantage to one business entity to the exclusion of others, the court held that it was unconstitutional as a violation of the equal protection clause.
It is difficult to ascertain the purpose of section 550.615(9) from a reading of the statute alone. However, it is helpful to consider this part of the law in the context of the entire law. Section 550.615 was apparently designed to increase revenues at pari-mutuel wagering facilities by allowing intertrack wagering. The entire section can be characterized as an exception to the state policy against off-track betting. Section 550.615(9) expands the exception by making it applicable to thoroughbred horse breeders. Before the enactment of this provision, horse breeders had not been involved in pari-mutuel wagering. Based on the undisputed evidence, the trial court concluded that the statute was originally enacted "to serve the public purpose of benefitting thoroughbred horse breeding sales and related economic activities."
We are unable to find any rational relationship between the detailed requirements of section 550.615(9)(a) and the object it was designed to accomplish. Given the purpose of the law, there is no reason to narrow the field of applicants by requiring the prospective licensee to hold a permit to race quarter horses.[2] If the specific topic of racing quarter horses is related in some way to the more general topic of breeding and selling thoroughbred horses, we are unable to perceive that relationship from the text of the statute.
Likewise, there is no apparent basis for the requirement in section 550.615(9)(a) that a prospective licensee must conduct "at least one day of nonwagering thoroughbred racing, with a purse structure of at least $250,000.00 per year for 2 consecutive years." We have not been presented with any rational justification for this rather detailed requirement and we cannot ascribe one to the statute on our own. Ocala Breeders is the only business entity that has ever obtained a nonwagering thoroughbred racing permit. Hence, we conclude, as the court did in West Flagler, that this requirement is not based on a reasonable classification, but rather it merely describes the entity that will be entitled to the license.
Furthermore, there is no rational basis for the exemption in section 550.615(9)(e), which provides that the holder of a quarter horse permit is qualified for an intertrack wagering license even if the quarter horse permit is otherwise subject to revocation. The trial court found that, although Ocala Breeders had obtained a quarter horse racing permit, it had never obtained a yearly pari-mutuel license to conduct live quarter horse racing. Additionally, the court found that the Division of Pari-Mutuel Wagering has revoked the quarter horse permits of other entities for failure to conduct live racing, but that the Division has never initiated a revocation proceeding against Ocala Breeders on this ground. Section 550.615(9)(e) cures this problem by providing that "[f]or each year such quarter horse permit holder must obtain the license set forth in paragraph (a), any provisions relating to suspension or revocation of a quarter horse permit for failure to conduct live quarter horse racing do not apply."
As we have explained, there is no rational basis in the requirement that limits the right to obtain an intertrack wagering license to the holder of a quarter horse racing permit. Assuming such an argument could be made, however, we think it is plain that there is no rational basis for the provision of section (e) which has the *28 effect of qualifying a quarter horse permit holder for an intertrack wagering license even if grounds exist to revoke the permit. This cannot be said to further the objective of the law. On the contrary, the exemption for those permit holders who might be subject to revocation merely enables Ocala Breeders to avoid one other potential challenge to the unique privilege it has been granted under the law.
The absence of justification for these criteria is underscored by the fact that the statute, on its face, authorizes but one thoroughbred horse breeder to engage in intertrack wagering. The statute was ostensibly enacted to shore up the thoroughbred horse breeding industry, yet it seeks to accomplish that purpose by awarding an exclusive franchise to one horse breeder. We recognize that pari-mutuel wagering is a unique subject and that the legislature has historically limited the right to engage in pari-mutuel wagering to particular businesses and particular geographic locations. However, the fact that only one license is offered makes the attempt to establish the criteria for the license all the more suspect. We conclude, as the trial court did, that statutory requirements for obtaining an intertrack wagering license are not rationally related to the objective of the legislation.
In summary, we hold that section 550.615(9) is invalid as a violation of Article III, section 10 of the Florida Constitution, because it is a special law enacted in the guise of a general law. Additionally, we hold that the statute violates the right to equal protection of the law guaranteed by Article I, section 2 of the Florida Constitution, because the criteria for obtaining a license to conduct intertrack wagering are not rationally related to the purpose of the law.
Affirmed.
MINER and WOLF, JJ., CONCUR.
NOTES
[1] The complaint challenged section 550.615(8), Florida Statutes (1995). In 1996, this section was renumbered to (9) by an amendment which did not make any material change. Throughout the briefs, the parties have referred to the disputed section as it appears in the more recent statute.
[2] The lack of any rational basis for this requirement is highlighted by the fact that it was removed altogether in more recent versions of the law. Section 550.6308, Florida Statutes (Supp.1998) does not include a requirement that the applicant hold a quarter horse racing permit. The purpose of the 1998 law, as stated in the first paragraph, is the same as the purpose of the present law.